So we will start the calendar. First case is Rod Massaro and the U.S. Equal Employment Opportunity Commission versus the New York City Department of Education. We'll hear from a pallet. Counsel, you may proceed. Good morning, ladies and gentlemen. My name is Natalia Capitonova and I represent the appellant in this case. I respectfully ask this Honorable Court to reverse the decision because there was a continuing violation in this case at the morning. And even if you find that a continuing violation did not exist, then the decision should still be reversed because the lower court failed to examine all the discreet and non-discreet acts before October 2015 to determine whether or not this causation exists. And here there is clearly a continuing violation and a wrongful connection given an appellant that is in private protected activity. In the context of the continuing violation, I agree with the EEOC standard that Morgan should apply and that the appellant did not need to show a policy or mechanism of retaliation in terms of probation. For the purpose of brevity here, I'm not going to discuss all the alleged acts since 2012, but I will refer the Court to pages 355 to 373 of the special appendix. And here the continuing violation existed that was enough to display a reasonable order for complaining. Even if it wasn't a continuing violation, it was important information as background, wasn't it, to the District Court in ruling on this case? Yes, Your Honor. In fact, this Court had in the RERA that that information is acceptable to see the whole context. Actually, before the RERA rule here, there is no right rule to show a wrongful connection and that experience and common sense should be used to consider the context in which a case occurs. Can I ask what it showed about the context? So we have cases like Morgan, as you mentioned, where the conduct that occurred outside of the time limitation, you know, showed racial animus or showed the kind of animus that you're trying to establish. But here the District Court seemed to think that what was outside the time limitation was just more discreet acts. It didn't show a pattern and it wasn't closely connected to the other acts that happened later, right? So what do you get from showing, from taking into consideration the other acts that are outside of the time bar? Well, Your Honor, you see the whole picture, the whole context of the claim. Here the Court ignored years of litigation between the appellant and the DOE. There are years of litigation that should be considered, at the very least, as a background, relevant evidence to determine revaluation. It can't be ignored. From 2011, the appellant brought the case for the first time. And then the case was finalized in 2014. All that, there is a series of events that happened. I understand that even if you find a non-continued violation exists, which I disagree with, it should be relevant to show the whole picture, just as you established in the record. So it's your theory of the case that all this flowed from your client being 59 years old, that it was based on her age, the Department of Education wanted to move her out? Yes, yes. I think it's age discrimination, maybe. Well, I know her age, but was there any evidence that anyone said anything about her age? Like she's too old to do the job or anything like that? So she didn't get the advantage of her years in service? The difference is that she was going religious. She was even asked to teach crosses after her surgery. No other teacher was asked that. She was the only one. She was unique in what respect? Well, she was the oldest, of course, but the recommendation she received for complaining was going religious. She had surgery, and within two days, the Department of Education denied her leave. She had to teach in a dark room with crutches, and her furniture was moved after the second day of the surgery. I mean, that is not something that... Her furniture was moved. How does she know that other teachers have furniture moved when their room is used for different purposes? Well, in this case, the room was used for photography, so it's different than... And she's complaining that it doesn't have a window. Yes, it doesn't have a window. So, I mean, a dark room, if you had a window in a dark room, you would have to seal it and keep out the light, wouldn't you? A dark room for photography. Yes. Having a window would be an inconvenience, wouldn't it? No, it would not, because that's what would have worked. It doesn't have to be a dark room. It doesn't have to be, but the fact that a room used as a dark room doesn't have a window doesn't seem to me like the basis for any kind of complaint. Well, Your Honor, maybe that's wrongly complained. I know. You keep talking about contexts and lots of individual things, the furniture moving, and she claims that her schedule wasn't as good as some people's schedules, but it was not worse than everybody's schedule. It was, Your Honor. It was four consecutive classes. No, it was two with a period in between and then another two. Well, in the year 2014, it was four consecutive classes. Did any other... That's an affidavit that says it was two with a space or an interval in between and then another two. I mean, I'm a former teacher. Two in a row is already hard. I grant you, but it's not four. No, I understand that. Well, I believe that you're referring to maybe the 15th or 16th year, but in the 14th year, I have pages in the record in which it says four one-hour consecutive classes, not one-room rooms. Did any other professor, any other teacher in the school have four consecutive classes that you know of? Not four. So she was the only one that you have discovered that had four classes in a row? If there were four in a row. But if there were three in a row and she had two plus an interval plus another two, then there would be a teacher who had a schedule that was worse than hers because it was some teacher that had three in a row, correct? Yes, but that's not what the legend is and what the record shows. She claims that it was four consecutive classes. Can you point me to the record, if you would like. It was a violation of the CDA. That's in page 60, A120, page 364, and it's in my reply brief. Also, she had a very large number of special ed students in her class. You can see that in my reply brief, page 6. The record, A158. She had a large number. Relative to what? Are you saying other teachers didn't have special ed students in their classes? I mean, special ed students are students. They have to be in class. If they want to take photography classes, then they're going to be in your client's classes. Of course, Your Honor. She's not objecting that there was any special ed students, but rather the number of students that were in her class. Did she have more than anyone else? Yeah, more than anyone else. If you go to the chart that I provided for your course convenience, page 6, it shows that in the year 14-15, in her class, she had 23 special ed students, while her teachers had 2, 4, 9. The teachers that had the most special ed students. You said 2, 4, 9. Those are all students on IEPs, right? That's like a list of all the students who have an IEP. Yes, and she has more than that. I mean, any student with an IEP is automatically a more difficult student to teach? I'm sorry, Your Honor, I couldn't hear the last part. Is any student with an IEP automatically a more difficult student to teach? No, not necessarily. In her case, they also became really disturbed, but right now... But then the city says that looking at the IEP, the number of students who actually had emotional disturbances or would have been more difficult, that number actually is not different between teachers. It's not what, Your Honor? It's not different between teachers. Well, here the number was different. She has more than that, the number of special ed students. And even though I agree, obviously, that special ed students have the right to be in classes, you cannot put for their own sake such a large number. I mean, it's just illegal. And as you can see, the other teachers did not have this schedule. Counsel, your time has expired. In conclusion, what do you want to tell us? I would like to say that this case really explains the continuing violation. And the whole picture, all the context of her prior work activity should be considered for the court to determine if a casual connection exists. I have a last question, I hope. She was denied a substitute teacher license. Yes. Now, that seems to me the kind of thing that constitutes a discreet act that could be actionable. But that seems to have dropped out of the suit. You settled that case, didn't you? You settled the license case in order to bring this appeal? Well, that was strategically decided because it's not an issue here at the Emporium. That's because you settled that one issue that was outstanding. We had some conversations with the client that was decided. Well, I don't understand. Of course you have conversations with your client. That's part of the pleasure of being a lawyer. But the question is, that was settled in this context or in what context? Well, it was decided not to dismiss it. Well, was she denied the license by her employer? Yes, she was. But that's not in this case. It was dismissed. Voluntarily dismissed, yes. It was dismissed on what basis? I believe it was voluntarily dismissed by the employer. We will hear from the Equal Employment Opportunity Commission. Otherwise known as the EEOC Council, who is, I believe, on Zoom. I am. Thank you, Your Honor. I assume you can hear me okay. I'm Jim Tucker with the EEOC. Thank you for allowing me to participate remotely today. I appreciate the courtesy. We are participating as amicus in this case to address two specific legal issues. The question of whether or how the Burlington Northern Materially Adverse Action Standard applies to retaliation claims sounding in harassment under the ADEA. And also the proper application of Morgan and its analysis for determining the timeliness of a harassment claim. It appears that, from the briefing, that the parties are not disputing the application of the Burlington Northern standard to this case. I observe that, in fact, this Court itself in the prior appeal in this case applied the Burlington Northern standard in determining that the District Court had erred in dismissing the retaliation claim. So I would ask the Court if it has any specific questions about our position on that. Senator, I'd be happy to address them. Otherwise, I would proceed to the Morgan question. And if any questions come up, please feel free to bring them back. As to the question of the proper measure of the timeliness of a hostile work environment claim, Morgan makes clear that the only consideration is to whether or not one of the constituent alleged acts of harassment occurred within 300 days of the statutory or within the 300-day time period for filing a charge. So long as one such act occurs, the entire alleged hostile work environment is considered timely. Right, but it has to be a constituent act of one unlawful employment practice, right? It has to be. Well, yes, Your Honor, and to be clear, Morgan states that the entirety of the hostile work environment is itself the single unlawful employment practice. Right, but you have to show that it actually is a hostile work environment. I mean, in this case, the court seems to think that it wasn't, right? She seemed to think that these were just separate acts and they were not linked together in creating a hostile work environment. So wouldn't that be a proper application of Morgan if she thought that they were not linked? Well, I'd say that there are a number of different analyses and examinations the Court has to perform in looking at a hostile work environment claim's viability. One is the timeliness question, and the Court, we've argued, applied an incorrect standard in determining the timeliness. But Your Honor is absolutely correct. The plaintiff still, even having a fully correctly recognized timely claim, has to show that the conduct that is alleged to create the hostile work environment is related to the alleged hostile work environment, and they do have to show causation. Right, so in Morgan, there are all of these racial jokes and racial epithets and harassment and so on, right? And it was pretty clear that that was a pattern. And so if that was like this case, you could imagine earlier non-time-barred conduct, earlier conduct that evinced retaliatory animus or something. But there wasn't that, right? There was just lots of separate acts, and the allegation was this altogether amounts to a hostile work environment. The district court doesn't have to just accept that conclusory allegation, right? All of these acts are linked such that it is going to be harassment. Again, I agree, Your Honor, that the plaintiff's burden is to show causation. There can't just be a conclusory statement. The Commission did not take a position in this case on the merits of the claims. It did not take a position on the causation analysis by the district court, so I'm not prepared to address that in detail. But again, as I stated earlier, Morgan makes clear that the questions of causation and the relevance of the constituent acts is a separate analysis that still has to be performed once the hostile work environment's time span has been determined. But do you not think that the district court did make that determination that actually this did not all amount to retaliatory harassment? Let me see if I can say this to answer your question. I'm not sure I'm getting quite your question, but let me point this out. Our position is that the district court's error here was to apply the continuing violation doctrine's requirement of a discriminatory practice or mechanism as the sole criteria used to determine whether or not the hostile work environment claim was timely. That is error under Morgan. So regardless of the fact that there may have been another basis for the court to determine that— I think it's error under Morgan because she's applying it as part of the continuing violation doctrine, but I think we just agreed a moment ago that in Morgan you still do have to determine that the harassment amounts to one unlawful employment practice, right? That's correct, Your Honor. So it is appropriate to determine whether there's a discriminatory practice behind all of the different acts. Let me say this, Your Honor. I'm not disagreeing with you. Morgan is clear and doesn't set out, and probably reasonably, but there isn't a particular order of operation here that you have to determine when it's timely, and then you have to determine whether or not it's causation, then you have to determine whether or not it's all related. So I think what you're suggesting is perhaps a preliminary examination into the question of causation. That may be what could take place. That's not how the court proceeded here. Again, our concern is primarily with the legal standard that the district court applied and making sure that that error does not repeat. Well, when she said, plaintiff provides no evidence supporting the inference that repeated conduct complained of was part of any discriminatory practice, and that said, as with her complaint and declaration, plaintiff lists the objective of conduct alongside the very conclusion that it was retaliatory. I mean, you're saying that that's error, but isn't that a determination consistent with Morgan that this is not a discriminatory employment practice? This is a bunch of separate acts, and so therefore I'm not going to apply the timeliness analysis you're suggesting because I don't think that there was one act of harassment. I think there was several discreet acts. I'll submit to you, Your Honor, that that may be a possible interpretation of an ambiguous statement by the court at that point where you've quoted discussing a discriminatory practice because immediately preceding that conclusion, the court had already said twice in its decision that there had to be, from the continuing violation doctrine, a discriminatory practice or policy or mechanism citing the Lambert decision, which describes the type of conduct that constitutes that mechanism as, for example, a discriminatory employment test or discriminatory seniority system, those kind of things. And so in our view, reading the district court's decision in that context, which I already identified that that's the type of analysis applying, that would be error. I see what you're saying. So you're saying to the extent that the district court thought that there had to be a very specific mechanism like a single test, that would have been inappropriate. But if the district court was, in fact, determining that the retaliatory conduct alleged was not linked such that it was not one act of harassment and there's lots of separate acts, that would be appropriate. That would be an appropriate analysis, but not in the context of timeliness, not to split hairs too much. But, again, Morgan is very clear about the proper approach for timeliness. But that would have been timeliness, right? Because if it was not one course of conduct that amounted to harassment, then it means that anything that was harassment has to be based on a specific time bar. I'm sorry. Could you repeat your question, Your Honor? There was some shuffle of papers. It would be relevant to harassment because – let me start. It would be relevant to timeliness because if, in fact, he decides there isn't one course of conduct amounting to harassment – Well, again, Morgan – It's going to be based on some subsequent event that's within the time limitation, right? I understand the reasoning you're applying. And, again, I think part of this is one of the factors or how you can think about the overall nature of a household work environment claim. But, again, the language of Morgan is very clear that for timeliness purposes, the only criteria that matters is whether or not one constituent act falls within the time frame. I think we're equivalent about – Do you think the continuing violation doctrine is just that there is no more such thing? Like, the distinction – Morgan doesn't break the distinction between discrete acts and ongoing acts, right? Like, that's the real distinction, isn't it? Well, it is a distinction, and Morgan makes that distinction, Your Honor. The dispensation of the continuing violation doctrine as a result of Morgan is simply to set aside those other analyses that existed previously. Like, for example, again, the example I gave earlier from Lambert of those types of discriminatory practices or mechanisms and using those as a way to bring in what Morgan now precludes, the notion of the untimely discrete act. Previously, before Morgan, you could bring those in if you were able to establish a continuing violation. Now Morgan says, no, no matter what, a discrete act that is independently actionable prior to the 300-day charge time period is out. That can't be brought in. So there is a meaningful distinction between Morgan and the continuing violation doctrine. Right. So Morgan said you can't bring in untimely discrete acts. That's correct. But it doesn't say that you can't draw this distinction between ongoing acts and discrete acts, right? Like, that distinction in the Petition Court applies. Is that precluded by Morgan? Again, I'm not sure I'm understanding your question, Your Honor. I'll just – and I don't mean to be too rote in repeating Morgan over and over again. Okay. It's a fairly – I think the court was trying to be fairly simple in trying to resolve issues that came up that were very complicated regarding the application of continuing violation doctrine over time. But, again, I think your point is taken as to whether or not the court can make some consideration as to whether or not the acts that are alleged to be part of the hospital environment are sufficiently related. That is part of the analysis. Morgan makes that clear that that is something the court still has to undertake. It just doesn't do it in the context of this. If you can imagine, again, this discrete, if you can separate it out discreetly, the question of the time that is spent. So the error that the district court committed, in your view, is that there was no analysis of the continuing violation theory. Is that correct? Well, actually, Your Honor, what we would say, it was error because the court did apply continuing violation theory, and that is the basis of its analysis. Because it applied that doctrine, that principle from the doctrine of the discriminatory policy or mechanism, to bar all conduct prior to the 300-day time period, it violated that essential principle of Morgan for a hospital work environment to be measured simply by whether or not one constituent act occurs within the 300-day time period. So the court did properly analyze, under the correct legal standard, the conduct that it considered to be timely. So it properly analyzed where was the error? Where was the error? I'm sorry, Your Honor. No, go ahead. Tell me where the error was. The error was simply in the measure of time. Because the court applied the wrong standard, it automatically excluded all conduct earlier than the 300-day window. And Morgan says that's not what you do. Morgan says you look to see if there's one constituent act, and if there is, you consider all the conduct alleged to be part of the hospital work environment for purposes of timeliness. Including discrete acts? Well, Your Honor, the commission did not brief that question. Quite frankly, we did not anticipate that that might be an issue that could come up in the case. We were focused more on just the mechanics of the timeliness analysis. But I would offer that the commission has taken the position that discrete acts, timely or not, can properly be considered as part of a hospital work environment, not for the purposes of recovery as a discrete act. For that purpose, there are, for example, a non-promotion. So what would you tell a jury to keep it from losing its mind? We would tell them that so long as that constituent act, whether it is a discrete act or it is something other than a discrete act, again, Morgan just talked about all of the evidence. It says take into account all the circumstances to determine whether or not the violation existed. We'd say that the jury could consider that. So are you saying that if there's a single act that's part of a continuing hospital work environment that is within the statute of limitations, you can go back forever into the past with all of the disputes and complaints and so forth, discrete, nondiscrete, and bring it all into evidence, but the jury has to decide damages only with respect to the nondiscrete acts that predate the statute of limitations? Let me put it this way, Your Honor. The way that Morgan describes the violation under a hospital work environment is that it is a single violation. The hospital work environment itself, the environment of the workplace is the violation. So you look at the constituent acts to determine whether or not that violation has occurred, and then you assign liability and then damages if liability is found. For those individual acts, let me say two things about those. Specifically, number one, a discrete act is not something that the plaintiff can recover for if it is an untimely discrete act. If it's a non-promotion, the person is not going to be entitled to be expated. But what if it's part of a continuing – what if it is within the time period of a continuing violation? Within the – well, within the period, it's still not going to be something unless it's presented specifically as a discrete act and they've brought a claim specific to that incident. That will not be something they can recover for because the hospital work environment analysis doesn't provide for that type of recovery. It still would have to be brought – if I'm not promoted at day 200 of the charge filing period, and I may have – and I can establish liability for that. I can recover backband damages if I bring it as an independent claim. If I allege the hospital work environment, I'm only able to recover for the hospital work environment. Now, as for your question about the timeframe, Morgan did not set out specific boundaries for the timeframe of the breadth of a hospital work environment claim. It identified specifically these type of claims are the result of cumulative acts that can take place over days or, in Morgan's words, years. It did provide for equitable remedies in those situations where they would be appropriate if there was too much of a delay in time for bringing suit. All right, so Morgan tells us how we treat timeliness when there is one unlawful employment practice, which is one hospital work environment. It doesn't answer the question of how to determine whether something is, in fact, one hospital work environment. Well, that question is left to the final – To other parts of the law, other precedents of the law, right. I mean, Morgan – right, there's – Just to go back to what I was saying before. It's pretty clear from the district court's opinion that she did not think that there was one employment practice that the plaintiff was alleging here, right? Right, and I think that's because she was confused about the – or the district court was confused about the analysis it was applying to understand what a hospital work environment is after Morgan. She was thinking about it in terms of continuing violation of doctrine. But you're just saying that Morgan tells us about the time limitation but doesn't answer that question as to whether there is a unitary hospital work environment as opposed to a series of acts where it would be appropriate to apply the time limitation, right? That's for Morgan. Excuse me, Your Honor. I have the same point. We're, again, talking a little bit about some things that are blended together, maybe some different concepts. She – not in the timeliness purpose, which, again, as I've said repeatedly, I won't repeat again, but there's separate analyses that go into the hospital work environment claim, whether the context is sufficiently relevant to be seen as a unified violation, whether or not there's evidence of causation. Right, so that would be appropriate for her to decide. Those two other elements absolutely have to be considered. Do you think that she did decide that? I mean, isn't that a pairing from the opinion that she's not persuaded that this is one practice? She went on to discuss those things, Your Honor. That's correct. Again, our concern was simply the way that she analyzed the timeliness question. Had the decision stopped at the point of the timeliness analysis, which it did for our purposes as far as our involvement in this case, there would be just plain error on that level because of the timeliness. So you want to clarify that one issue, but you're not taking a position on whether the judgment might ultimately be affirmed because of this other ground. That's correct, Your Honor. Thank you, counsel. You've reserved two minutes for rebuttal. So we'll come back to you now. We'll hear from the New York City Department of Education. Good morning, Your Honors, the attorney for the appellees. I think the key thing to look at, and I think this is what the panel has seen it, is the context of all the allegations that Plaintiff is making. And in that context, she's saying that everything that happened to her was a retaliatory act. When you look at it, as Your Honor has pointed out, to each of those individual claims, she was not treated more, but better or worse than anyone else. What about four classes in a row? Yes. So if you look at record page 8139, that's the first semester of 2014-15. She has two classes in bands A and B, then two breaks, then two classes in E and F, a break, and then a band H class. But is there a year in which she has four in a row? I mean, there's no point in going through every year. We have lots of years here. Exactly. And the years that she is alleging— What is the year that she's alleging? The year that she is alleging, I believe, is 15-16, and in either 15-16 or 14-15, in this record evidence, is there four consecutive classes. In fact, if anything, there's a teacher that has clearly three consecutive classes, as you pointed out, but she clearly is not showing us two consecutive classes and then breaks. So I don't know where that allegation is from, and if it is her claim, it is not supported. What about the—I mean, she has a photography class. What about the assignment of large numbers of children who have special needs? So— That isn't—I mean, that's an increment on workload. So if you look at her—let's start with her class size. Her class size, which is at the record—we will get our response to her discovery request at pages 150 and going on from there in the record. The class sizes are all in the average range. Hers, as well as all the others, there are about 25 to 35 students. She is not—she alone is not at 40, and everyone else has 20. But I think she claims that she has—she alone is at the top of that. Every year. All the time. No. Again, the numbers, the record evidence shows otherwise. There are teachers who have 30, 32. She has 32. There are teachers who have 33. She has 33. Again, she is in—all the teachers are in about the same average range. With respect to the IDPs— How many teachers are there? In the fine arts department, there are one, two, three, four, five, six, seven, eight, nine, including artists. So you're saying that in each year, there's one teacher who had as many students as she. Absolutely. But there were then many, maybe five or six, that had nowhere near the number. I'm trying to get a handle on whether we're looking at something sufficiently discreet, because that is a serious increment of workload. In theory, yes. But if you look at the record evidence and all the teachers through these years in the fine arts department, they all averaged the same. She is not alone in having 34 students. There are more than one teacher. I think you were about to address the IEPs, which is how she substantiates this. I'm putting that chart in the reply brief with the number of students with IEPs in each class. Why don't you explain your response to that? So if you look at page 158 and on from that, that's the IEPs. Every teacher has students without IEPs. And again, her claim that because she had an IEP, as you pointed out, Your Honor, an IEP by itself does not represent a disruptive student or a student who is not capable of doing her photography class. The record doesn't bear out what the IEPs were for. So to automatically say I have more IEPs when she herself is even a special license in special education, it's a little disingenuous to say because I got maybe in one year more than someone else, aha, there's something wrong. It's retaliatory. Every teacher has students without IEPs. And particularly with the emotionally disturbed students that she's claiming she had, if you look at the exact page, again, 172 of the record, throughout all the years she only had in one term, one, and then another teacher, and every other year she had zero. And then if you look at, I'll get the name of the teacher for you, can't find the teacher's name, but there was another teacher who, yes, Mrs. Holcomb or Mr. Holcomb, I don't know, in the first term also had one student. And I'm sorry. Here, I'm sorry. Mr. Megan, in term one of the 1560 year, had one student. Every other teacher, all of them, including Mr. Massaro, had zero students with an IEP except for that one first term, and then she didn't have any. What about having to work after her surgery? No, I'm sorry. What about having to work after her surgery? So with respect to that, Your Honor, that again is just an isolated incident, and with respect to her claim that her bulletin board was removed, again, every teacher was notified by email that their bulletin boards had to be taken down. Her furniture that was removed, she was sharing that room with someone else that was no longer using it, and then the teacher said, I'm going to help you. I'm going to remove the furniture. I'm labeling your furniture. It's not needed in that room anymore. But she came, she was ordered to come in two days after surgery. What kind of surgery was it? In any event, she did come in, so she could. I mean, it isn't as though she was ordered to come in two days after surgery. That was unreasonable, and she couldn't. And then she was sanctioned or punished or got a letter of discipline because she failed to come in. And all of her evaluations, except for those early ones that you say are outside, even the one where she said that she was reviewed at the last day of the term, she was rated effective and highly effective. So her claim that— What about her statement that she was criticized for not moving around the classroom when she was on crutches? She wasn't criticized, Your Honor. She was told that she had to, and then all teachers were told that they had to, and then not a supervisor but maybe a—actually, I should take that back. She then alleges that only hers, but, again, there's nothing in the record to support that all the teachers' bulletin boards were removed and only hers. The record—you need to look—she needs to have in opposition to our summary, Judge Roach, Your Honor, is a competent proof. The competent proof in the record belies almost all, if not all, of her allegations. Just a second. What about her sworn affidavit? Her sworn affidavit repeats the same allegations. But her sworn affidavit is discounted by the trial judge because she thought it was just a sworn affidavit. Isn't that admissible evidence? No, absolutely it's admissible evidence, but it's only her statement. There's nothing in the record to back that up. I know it's only her statement, but it's her statement. If it's not controverted, it's to be believed, isn't it, at the summary judgment standard? Isn't she always supposed to believe what she says? But everything the record does, it does controvert her with her sworn statements. The overarching thing that Plaintiff is making, or her statements, is that everything that happened to me was retaliatory because I followed a suit. And that's not true, Your Honor, given the— Then why—if that wasn't true, why did everything happen to her the way she describes it? Her life was hell, as I read her affidavit. But that's the issue, Your Honor. Her life wasn't hell when you look in context of every other teacher. You mean every teacher's life was hell? Are you saying every other teacher's life was hell? No, I'm saying that every other teacher experienced similar things. There were teachers who were in that dark room or that room without windows. Plaintiff had a dark room. She needed that room, but there were mad teachers in that room. Let me see if I can understand. It is evidence to submit an affidavit that says these things happened and they happened to me. Correct. You're saying that they were refuted with evidence, with attendance records, with records of assignment of teachers and everything else. Correct. Everything in the record— So when you say it's just—the judge says it's just her affidavit, it's not saying an affidavit is in—it does not constitute admissible evidence. We're dealing with an experienced judge here. The judge is saying that it was refuted by admissible documentary evidence. Yes. If I had spoken to her, I did not need to suggest that her affidavit was inadmissible. Sure. I'm suggesting— But no, the judge thought that her proof was weak, if nonexistent, because it was based solely on her sworn affidavit. She discounted that, the judge, in her decision. Even if this Court were to now look at her affidavit, it still boils down to nothing that she said in her affidavit, which is almost identical to her complaint, is supported by anything in the record. And that's what we're trying to point out here. Counsel, you spent all this time saying that there is no question, and it wasn't—there wasn't retaliatory conduct. But didn't the district court make a decision based on the time limitation? So the ground of the district court—did the district court actually decide that there wasn't retaliation, or did the district court say the claims are time-barred and, therefore, there's no question? Yes, it appears that the district court went right to the causation part of it. We wanted to, you know, paint the picture for you, to show you— So even if we agree with you, are you saying that that's an alternative ground on which to affirm the district court, or did the district court actually also reach that question as to whether there was retaliation? I believe the court said that, in her opinion, it was in the aggregate material at first. We think differently on it, and that's why we painted this picture to show you otherwise. But even if the court were to find that this was somewhat retaliatory, the causation element comes right in. Okay, so then why do you—so then can you tell me—so we've just heard from opposing counsel and from the EEOC about the erroneous application of Morgan, and why isn't that right? Why isn't that an effort for the district court to make? So I think, as Your Honor pointed out when speaking with the amicus, Morgan still requires—and it says here at page 277 of the Morgan decision, or I think I have the wrong page number, but at the very end, just before the dissent, it specifically says, a charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice. That's still required of a plaintiff. And so the court, the district court, and we agree that you still need to show an over-auction policy, and that's why we also put in that first point of our brief to show the picture. There is no policy at all. I understand that I was suggesting this in the other questioning, but do you think the district court determined that there was no overarching policy amounting to harassment, or the district court was applying the continuing violations doctrine and saying, because there isn't one specific thing like an aptitude test or something behind the different acts, I can't consider them as a continuing violation, and therefore I'm going to apply the time bar? If I recall, I believe the district court found that there was no overarching policy. It was nothing. None of these acts were similar enough in nature to create an overarching policy. In fact, we've shown that there really wasn't even any policy at all, that these were just individual acts. Other teachers experienced them as well. What I think the plaintiff, as well as the amicus, are saying is that in their reading of Morgan, any time you are claiming retaliation over that maybe one thing happened this year, one thing happened this year, that becomes the hostile work automatically, and then there is no more continuing violation, excuse me, and you go right into the continuing violation, and that's not what Morgan says. In fact, I don't believe that this court or any court has yet automatically said that a retaliatory case or a retaliation claim automatically becomes a hostile work environment claim absent an overarching, that there's something that shows that she… But she made a hostile work environment claim, right, or a retaliatory harassment claim, which is similar. Well, we disagree, Your Honor, in that respect because of the context that we showed you, because nothing that occurred to her, everything that occurred to her, I should say, most of it was all these discrete acts, something that occurred, she had more, maybe, according to her, more students in the classroom, but that's not a policy that was designed because she filed a suit. That's what you say. She says it was designed because she filed a lawsuit in 2012. Correct. And aren't we supposed to draw all inferences in her favor at the summary judgment stage? And if you do draw all inferences, it's still, even if she did suffer having more students in her classroom, which is why, by the record, there are still time-bar acts and timely acts, and the time-bar acts are not saved by this continuing violation, because even still, there needs to be shown, under Morgan's bill, this overarching, this same… Right, but that's not the continuing violation doctrine. That's the idea that there isn't one act of harassment, and therefore they don't all come together. But if, in fact, there was an act of harassment, then it wouldn't be appropriate to time-bar some parts of it and not time-bar other parts of it, right? But it still requires the same discriminatory employment practice, and simply because some… She's alleging that… Well, it requires a discriminatory employment practice. I'm not sure if it's the same one, but… Okay, I think I have that argument. Yes, you do. So the bottom line is, and what we want to point out, is what she experienced was not unique to her, and that is, to us, the overarching picture of this case, to show you that what she experienced, everything that she's labeled retaliatory, was not. It was the lie by the record that showed that every other teacher experienced something similar. And to the extent you disagree, there are time-barred acts and timely acts, but the time-barred acts are… Oh, well, the timely acts, they were discreet, or, excuse me, they were discreet and too far remote, and the time-barred acts are not saved by any continuing violation doctrine. Thank you. We have your argument. Thank you. I understand that the two-minute rebuttal was requested by Massaro, not by the EEOC, so you may take it now. Thank you, Your Honor. In regards to the four consecutive classes, if you see the deposition of the A.B. Constantinis, he admits that she had four consecutive classes. Without a break? We're all right. You have testified that her study will change under the problem and won't characterize it as a problem, but the teaching four classes in a row will change in the second semester. The answer is yes. She admits that her study will change in the second semester, but she admits that she had the four consecutive classes, and that perhaps there was a discrepancy because it appears that that was in the year 13-14 instead of 14-15, but you can see that in the record, A.298, and that's the deposition of the assistant principal from the DA. Now, going back to the Supreme Court, what they held in Morgan, that you have to look at all the discrete and non-discrete acts as relevant background information. This was not done in this case. Since this is a case of retaliation where the background was also relevant, it should have been done. Her life as a teacher, as you can see, was miserable. She had to work in pain. She had to work after surgery. She was given no time. She came in after surgery, didn't she? I mean, if she couldn't, if it was unreasonable to ask her to come in, which could well be, depending on the surgery. But she came in. She came in because she was told that she had to come in. I mean, she actually had a doctor's note that said that she was supposed to come back in July. But the principal said, no, you have to come back now. And she had to teach at our home. She can't even see where she's going. She doesn't know how to study. She has to teach. She's the only person who perfected her activity and the only person that was made to teach in this situation. The record, like they said, they provided everything. That does not show any other person that had to use the activity in a sorrowful manner. And it does not show any other person that was forced to teach in consciousness. The department's answer, when I asked about life being hell, said all the teachers' lives were hell. Teaching is not an easy profession. It's a very hard profession. No, I don't deny that. But it seemed that Ms. Sauer really suffered and that her life was hell. But the answer from the department was everyone had the same life. Well, I don't see certainly anyone being forced to teach with crutches. I can say that I know the record on that quite well. And you can see there is no person that was forced to teach in this situation.  That itself was a discriminatory practice for which you're covering. Your claim is that there was a whole hostile work environment or there was harassment. So you're saying that the incident with crutches is just one example of a pattern, right? Yes, one more example of all the retaliatory acts that happened after the dismissal of the lawsuit. So you're saying that she was forced to teach with crutches because the department was upset about the lawsuit she had filed, right? Yes, Your Honor, because she had a doctor's note that said that she had to cover her life. Is there some evidence that shows that the school district was upset about the lawsuit that she had filed? Well, the evidence you can see in all the acts together in the whole country from everything that she's suffered. I don't think that's not the question. It's an interesting question. What is there to show that anybody in charge at the school was annoyed, upset, or enraged by the EEOC complaint? Well, Your Honor, it doesn't have to be a clear comment. No, it doesn't. It could be something else. It doesn't have to be clear. Well, what was there? Yes, a series of events that she experienced. So as we're sitting here this morning, opposing counsel said she never had four classes in a row. There was always a break, and you brought us evidence that her supervisor said she did. So it seems to me this is a factual discrepancy, and that is not a candidate for summary judgment. Yes. Yes, Your Honor. I mean, the court's rumors here, the deposition that I brought to your attention is a deposition of the EEOC. It's not even our complaint. So was the district court finding facts? The district court didn't get to see this because it was outside the litigation period. This was in 13-14. The district court did not look at any events before October 5, 2016. So the district court didn't even consider this to see the whole context of retaliation, and that's why we allege that they made an error of the law. Because even if they found that all the facts were not a continuing violation, at the very least, the court had to see everything in the aggregate to see the context of the claim. Can I ask what context it provides? So if it's one more incident that you're saying, if that came in and you consider that for context, how does that incident put the rest of the conduct in a different light? Well, Your Honor, it's not only one incident. I'm just pointing out the objective period, but there are many incidents. In fact, I pointed out— But you're saying that we could bring in the time bar conduct because it just creates a closer temporal connection with the lawsuit, right? It's not like it illustrates that the school district was upset about the lawsuit or had some kind of animus. It's just, well, extend the course of conduct further back into time, closer to the time that she got the lawsuit. Yes. Part of the conduct illustrates why the ADOE was upset about this thing. In your area, it was held that temporal proximity was okay for two years, from the complaint to the denial of the paid internship. And this court held that was okay because they had to see the whole context. And here, the claim is not that far apart. And still, everything— I believe that this is a case for which a continued violation should exist, right? I mean, they have so many—she has so many retaliatory acts to create a continued violation. And even if it doesn't, I mean, the court still has to use— So I want to ask a question about what went on in the trial court. You said she didn't see your evidence of four classes in a row. But opposing counsel gave us the data that obviously went to the judge about two classes with a break and then two classes. How did the judge get that information if she didn't get your information? Well, Your Honor, that was in the record. However, the decision says that the decision paper is a non-timely— I see. So she didn't look. She only considered the timely acts. She didn't look at anything before that. And that is a violation of— I'm sorry, but then when the district court is talking about— When the district court is talking about retaliation, the district court says, although plaintiff states without reference to the record that she was treated differently from her co-workers, the overwhelming record evidence shows that fellow teachers worked under similar conditions as plaintiff, including comparable schedules, class sizes and compositions, and access to educational resources. Doesn't that suggest the district court looked at this evidence about schedules and was just persuaded that actually it was not different from the other teachers? I understand you disagree with that, but the district court thought she had a similar class schedule to other teachers. And that's what the overwhelming record evidence shows. And there really wasn't the question of material facts about that. Well, Your Honor, in the decision, the court pointed out that in the decision, that was not a factor to determine whether there was causation. In other words, she could have been accused of this act before, but there weren't— Right, no, I understand, but then it's a reason why the district court thought there wasn't retaliation. Even if they thought it was not retaliation, there weren't even uses of background information. She delineated very clearly time for us and non-time for us and made a decision on causation based on— Actually, I take that back. I mean, it is under the heading of causation, right? So she's determining whether there was causation. She says, the overwhelming record evidence shows that fellow teachers worked under similar conditions, including comparable schedules. I mean, doesn't that suggest—I understand she also has this other question about the time bar, but the district court seemed to think that your client had a comparable schedule to the other teachers and wasn't treated differently. Now, you're saying that you think the district court was wrong about that. To the extent that I agree that the district court thought she had the same schedule of the other teachers, yes, I disagree. I actually read the position from the AP that admitted that she did not have the same schedule. She had four consecutive classes. We'll have to end it here. This has gone on much longer than the time allowed, and I did that intentionally because the argument was so interesting and so good. So we will reserve decision.